**In the United States District Court
for the District of Southern Illinois**

| | |
|---|---|
| Mohamed Al-'Owhali,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>Federal Bureau of Prisons, Michael Carvajal, Gene Beasley, Barb von Blanckensee, and Daniel Sproul, in their official capacities,<br><br>　　　　Defendants. | 21-cv-1399 |

**Complaint
for Declaratory and Injunctive Relief**

## I. Nature of the Action

1.　This lawsuit concerns the imminent transfer of Mohamed al-'Owhali from United States Penitentiary Marion ("Marion") to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX"). Mr. al-'Owhali seeks declaratory and injunctive relief requiring the Federal Bureau of Prisons ("BOP") to comply with the Eighth Amendment and its existing policies regarding the treatment of mentally ill prisoners—in particular, its policy of not placing mentally ill prisoners into a facility designed for the solitary confinement of prisoners.

2.　ADX is the most secure federal penitentiary in the United States. It currently houses approximately 450 men. Prisoners spend at least 20 and as many as 24 hours per day locked alone in isolated cells and are subject to a harsh and

1

unforgiving disciplinary regimen. Such isolation and brutal discipline are inappropriate for prisoners who are seriously mentally ill.

3. The Eighth Amendment prohibits housing men and women with serious mental illness in supermax or other solitary confinement conditions.

4. According to the BOP's own policies, prisoners with serious mental illnesses should not be assigned to ADX. Upon information and belief, those policies reflect the BOP's recognition that extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health and can be particularly harmful to prisoners who had mental health problems before being confined in such conditions.

5. The Plaintiff is Mohamed al-'Owhali is incarcerated at USP Marion and is seriously mentally ill. During the past two decades of his incarceration, Mr. al-'Owhali has been diagnosed with depression, Bipolar Disorder, Generalized Anxiety Disorder, and Schizotypal Personality Disorder.

6. Defendants are the BOP and several of its senior officials. Defendants are responsible for operating both Marion and overseeing transfers ADX. Defendants are responsible for ensuring that prisoners'—including Mr. al-'Owhali 's—constitutional and other rights are respected. Defendants either have failed or are about to fail to meet these obligations to Mr. al-'Owhali.

**II. Jurisdiction**

7. Mr. al-'Owhali brings these claims under the First, Fifth, and Eighth Amendments to the United States Constitution.

8.  This Court's subject matter jurisdiction over the allegations in this Complaint is based on 28 USC § 1331, in that the claims for injunctive relief arise under the United States Constitution and federal statutes.

### III. Venue

9.  Venue is proper in the Southern District of Illinois under 28 USC § 1391(b) because a substantial part of the acts or omissions that give rise to Plaintiff's claims occurred or will occur in the Southern District of Illinois.

### IV. Parties

10. Plaintiff Mr. al-'Owhali is a 44-year-old Saudi Arabian man currently incarcerated at Marion, a facility under the control of the BOP. Mr. al-'Owhali has been diagnosed with depression, Bipolar Disorder, Generalized Anxiety Disorder, and Schizotypal Personality Disorder. Despite these diagnoses, in hearings conducted on or about September 27, 2021, BOP officials recommended transferring Mr. al-'Owhali to ADX, an action that will cause significant harm to Mr. al-'Owhali.

11. Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice and is responsible for administering federal prisons, including USP Marion and ADX. The BOP maintains physical custody of Mr. al-'Owhali. The BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal prisons.

12. Defendant Michael Carvajal is the director of the BOP. Plaintiff al-'Owhali brings this suit against him in his official capacity.

13. Defendant Gene Beasley is the deputy director of the BOP. Plaintiff al-'Owhali brings this suit against him in his official capacity.

14. Defendant Barb von Blanckensee is the regional director for the North Central Region of the BOP. Plaintiff al-'Owhali brings this suit against her in her official capacity.

15. Defendant Daniel Sproul is the warden of USP Marion. Plaintiff al-'Owhali brings this suit against him in his official capacity.

**V. General Allegations**

### Background and operation of ADX

16. At any given time, between 400 and 500 prisoners are housed at ADX.

17. Depending on which unit they are in, prisoners spend at least 20 and as much as 24 hours per day locked alone in their cells. The cells measure approximately 12 feet by 7 feet. The cells have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with prisoners in adjacent cells. All ADX cells have solid doors with a small closable slot. Each cell is furnished with a concrete bed, desk, stool, and a stainless-steel combination sink and toilet. The beds are usually dressed with a thin mattress and blankets over the concrete. Each cell contains a single window, approximately 42 inches tall and 4 inches wide, which allows entry of some natural light but which is designed to ensure that prisoners cannot see anything outside of their cells other than the building and sky. Meals are delivered three times a day. With few exceptions, prisoners in most ADX units are allowed out of their cells only for limited social or legal visits, some forms of medical treatment, visits to the "law library" (essentially a cell with a specialized computer terminal that provides access to a limited

range of federal legal materials) and a few hours a week of indoor or outdoor recreation. Otherwise, they remain locked in their cells.

18. In all units at ADX, Defendants make a determined and calculated effort to dominate prisoners with punitive techniques that include the use of extended periods of isolated confinement in the Control Unit or SHU and threats of other punitive measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail). The behavior of mentally ill prisoners deteriorates very rapidly when they are placed into programs designed to punish rather than control unacceptable behaviors.

19. While Mr. al-'Owhali does not dispute the need for security at ADX, he contends that its brutal disciplinary model is inappropriate for mentally ill prisoners.

**The effects of solitary confinement on prisoners' mental health**

20. Correctional officials and mental health professionals have known for more than 200 years that extended periods of confinement in isolation can be psychologically damaging and particularly harmful to individuals with preexisting mental illness. It is well understood that extreme isolation for even a few weeks can result in psychosis, social withdrawal, insomnia, depression, hallucinations, rage, aggression, self-mutilation, and contemplation of suicide.

21. Despite the mountains of anecdotal and empirical data confirming the impact on mental health of extended isolated confinement, the BOP has determined that it will move Mr. al-'Owhali there.

### The BOP's policies concerning evaluating, housing, and treating mentally ill prisoners at ADX

22. The BOP's written procedures for transferring prisoners to ADX state that prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX." BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18.

23. Housing seriously mentally ill prisoners at ADX is against BOP policy. "Ordinarily, seriously mentally ill inmates … are diverted from … ADX placement and CARE4-MH inmates are not placed in these facilities." BOP Program Statement 5310.13, p.19. According to BOP's own policy, serious mental illnesses include Schizophrenia- and Bipolar-related disorders. *Id.* at 1-2. Anxiety disorders qualify as serious mental illnesses "if the condition is sufficiently severe, persistent, and disabling." *Id.*

### Mr. al-'Owhali 's mental health issues

24. Since being incarcerated in 1998, Mr. al-'Owhali has suffered from many psychiatric problems, including suicidal ideation, General Anxiety Disorder, Bipolar Disorder, and schizotypal disorder. In June of 2021, these issues culminated in Mr. al-'Owhali 's attempt to take his own life by swallowing handfuls of prescription medication. As a result of his suicide attempt, BOP officials placed Mr. al-'Owhali on suicide watch

6

on June 17, 2021. Mr. al-'Owhali has been taking psychiatric medications throughout his incarceration.

25. BOP records confirm that getting a correct diagnosis has been hampered by lack of communication. Mr. al-'Owhali is a native Arabic speaker, and English is not his first language.

26. On November 6, 2000, BOP officials became concerned that Mr. al-'Owhali would attempt suicide after Mr. al-'Owhali told officials that he intended to kill himself. BOP officials placed Mr. al-'Owhali on suicide watch because of these statements.

28. On November 1, 2002, a BOP mental health professional described Mr. al-'Owhali as having "mild to moderate levels of depression."

29. Several months later, on January 16, 2003, a BOP mental health professional placed Mr. al-'Owhali on suicide watch because he had suicidal thoughts and impulses. During the professional's assessment, Mr. al-'Owhali reported that he had suicidal impulses. As a result of these impulses, Mr. al-'Owhali asked that medications be removed from his cell because he was considering suicide by overdose on those medications.

30. The following day, the same mental health professional more thoroughly evaluated Mr. al-'Owhali. During that evaluation, Mr. al-'Owhali described multiple ways he had considered committing suicide. Mr. al-'Owhali reported problems with depression, difficulty sleeping, acute anxiety, and suicidal impulses.

31. In November 2011, Mr. al-'Owhali began taking the psychiatric medication Buspar for anxiety. During his visit with a mental health professional on November 7, Mr.

al-'Owhali described having intrusive thoughts, difficulty concentrating, disorganization, and lack of motivation. The following February, the BOP increased Mr. al-'Owhali's dosage of Buspar from 5mg/day to 10mg/day. After the increased dosage appeared ineffective, the BOP discontinued Buspar and switched to a 50mg/day dose of Sertraline, another psychiatric medication.

32. In October and December of 2013, Mr. al-'Owhali discussed his childhood diagnosis of ADD/ADHD with a BOP psychologist.

33. In June 2014, a BOP psychiatric evaluation revealed that his chronic anxiety problems had become worse.

34. Several months later, on October 6, 2014, Mr. al-'Owhali was formally diagnosed with Generalized Anxiety Disorder. His symptoms included worrying without reason and hypochondriasis, as well as somatic symptoms such as a racing heart, sweating, shaking, and cluster headaches. He also reported poor sleep, poor appetite, and self-isolating behavior. As a result of this diagnosis, a BOP mental health professional prescribed an increased dose of Buspar.

35. On October 21, 2014, a psychiatrist formally diagnosed Mr. al-'Owhali with Bipolar Disorder. During his visit with the psychiatrist, Mr. al-'Owhali explained that his family has a history of bipolar disorder, that he has racing thoughts, that he is disorganized, and that he will sometimes do crazy things. The psychiatrist proscribed a 50mg/day dose of Amitriptyline, a drug used to treat mood disorders.

36. Throughout October 2014, Mr. al-'Owhali reported to BOP staff that he was having trouble concentrating to the point that he could not engage in cognitive behavioral therapy ("CBT"). While BOP mental health professionals provided him with

CBT worksheets, Mr. al-'Owhali did not complete them. Between October and December of 2014, BOP officials reported that Mr. al-'Owhali's room was disorganized and cluttered and that Mr. al-'Owhali failed to complete his CBT worksheets due to his inability to focus. BOP mental health professionals repeatedly noted his concentration problems.

37. During a February 2015 session with a BOP doctor, Mr. al-'Owhali reported having a depressed mood to the point that he was having difficulty functioning. He also reported having significant problems with anxiety and panic attacks at night. The BOP doctor prescribed 20mg/day of Fluoxetine, a common anti-depressant also known as Prozac. The BOP increased Mr. al-'Owhali's dosage to 40mg/day on July 1, 2015.

38. On May 5, 2015, a BOP psychologist replaced Mr. al-'Owhali's diagnosis of General Anxiety Disorder with Schizotypal Personality Disorder. Other BOP officials later questioned this change of diagnosis and noted the need to reconcile the conflicting diagnoses.

39. Before the diagnoses could be reconciled, the BOP transferred Mr. al-'Owhali to USP Marion in September of 2015. Before transferring him, the BOP generated a medical report on Mr. al-'Owhali, which stated that he had Schizotypal Personality Disorder, Bipolar Disorder, and anxiety problems. During Mr. al-'Owhali's initial medical evaluation at Marion, a BOP doctor noted these diagnoses and that Mr. al-'Owhali was currently taking 20mg/day of Fluoxetine.

40. In April 2016, Mr. al-'Owhali determined that Fluoxetine was no longer effective and began refusing his medication.

41. In June of 2021, Mr. al-'Owhali attempted suicide. He took handfuls of an unknown prescription medication. BOP officials placed Mr. al-'Owhali on suicide watch on June 17, 2021.

**Events leading up to Mr. al-'Owhali's planned transfer to ADX**

42. On December 19, 2021, a fellow inmate, Reginald Strother, made aggressive moves towards Mr. al-'Owhali. Specifically, that Strother removed his shirt and took a fighting stance while facing Mr. al-'Owhali. Feeling threatened and believing that Strother was about to attack him, Mr. al-'Owhali kicked the inmate in preemptive self-defense.

43. The following day, several Muslim inmates—none of whom were Mr. al-'Owhali —assaulted inmate Darnell Moon. BOP officials erroneously identified Mr. al-'Owhali as a participant in this attack.

44. A disciplinary hearing was not held until September 24, 2021—almost a year later. Mr. al-'Owhali requested two witnesses to participate in his defense. Even though the BOP had custody of both of those witnesses, Reginald Strother and Kevin Davis, at the time, the BOP did not make either available to testify. Mr. al-'Owhali also requested video footage and still shots, also in the control of the BOP, that would exonerate him. The BOP did not provide him with this footage.

45. At these hearings, Mr. al-'Owhali's staff representative was Chaplain Harmon, who admitted that he had not been able to view the video footage, video still shots, and incident reports. Chaplain Harmon was likewise unable to conduct other investigative steps that Mr. al-'Owhali requested.

46. Despite preventing him from mounting a defense, the BOP found Mr. al-'Owhali guilty of assaulting inmates Reginald Strother and Darnell Moon.

47. The hearing report regarding the incident with inmate Strother makes explicit references to Mr. al-'Owhali 's being Muslim. Specifically, it describes the events leading up to the incident as an argument between "the Muslim inmates and Strother."

48. The hearing report regarding the incident with inmate Moon likewise references Mr. al-'Owhali 's religion, again lumping him in with a group of "Muslim inmates."

49. Although BOP policies provide Mr. al'Owhali twenty calendar days in which to appeal his disciplinary findings, the BOP relied on the hearing findings in the transfer hearing, without giving him a change to appeal the findings.

50. On September 28, 2021, the BOP conducted a hearing to determine whether to transfer Mr. al-'Owhali to ADX. The hearing was conducted by Hearing Administrator I. Hernandez, who recommended that Mr. al-'Owhali be transferred to ADX. At no point did the Administrator reference Mr. al-'Owhali 's mental health or the multiple diagnoses which disqualify him from placement in ADX. In making his determination, the Administrator relied on Mr. al-'Owhali 's disciplinary record, including the results of the September 24 hearing and Mr. al-'Owhali 's status as a leader of the USP Marion Muslim community. Specifically, the Administrator wrote that Mr. al-'Owhali "held an influential (leadership) role among the Muslim inmates in [Mr. al-'Owhali 's] assigned unit" and that Mr. al-'Owhali "took advantage of leading prayer to engage and direct other inmates to engage[] in violent acts against other inmates."

**VI. Claims for Relief**

**First cause of action: Religious discrimination in violation of the First Amendment**

51.     Plaintiff incorporates by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

52.     Defendants intend to transfer Mr. al-'Owhali to ADX as punishment for his association with and leadership role in a group of Muslim inmates. This directly infringes on his First Amendment rights to exercise his religion and associate with those he chooses. Mr. al-'Owhali would not have taken on a leadership role in his prayer group if he knew transfer to ADX was a possible outcome.

53.     The decision to transfer Mr. al-'Owhali has no rational connection to any penological purpose. Mr. al-'Owhali did not participate in the attack on inmate Moon and his actions concerning inmate Strother were in self-defense. Transferring Mr. al-'Owhali will not deter him from future misconduct because there was no misconduct to begin with. It will not punish him for misconduct that did not occur. And it most certainly will not rehabilitate him.

54.     Transferring Mr. al-'Owhali to ADX will leave no alternate means of exercising his rights to practice his faith, including through group prayer. ADX effectively houses its inmates in solitary confinement. That is, inmates spend at least 20 hours per day confined to a seven by twelve-foot cell and are isolated from other prisoners. Mr. al-'Owhali simply cannot participate in group prayer in such conditions.

55.     Transferring Mr. al-'Owhali to ADX will have terrible repercussions for his psyche. Mr. al-'Owhali has been diagnosed with Bipolar Disorder, Schizotypal Disorder, and Generalized Anxiety Disorder. It is well known that solitary confinement is especially harmful to individuals with preexisting mental health problems. Psychologically ill

inmates placed in solitary frequently attempt suicide and engage in self-mutilation. Subjecting Mr. al-'Owhali to the conditions at ADX, especially considering his recent suicide attempt, jeopardizes his safety.

### Second cause of action: Violations of the Fifth Amendment

56. Plaintiff incorporates by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

57. Transfer of Mr. al-'Owhali to ADX will impose a significant and atypical hardship, without due process of law.

58. He has been denied meaningful notice and adequate hearings for his disciplinary charges and for transfer to the ADX.

### Third cause of action: Violation of the Eighth Amendment

59. Plaintiff incorporates by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

60. Mr. al-'Owhali has serious psychiatric problems. The BOP acknowledges that Mr. al-'Owhali 's psychiatric diagnoses—particularly Schizotypal and Bipolar disorders—are severe. That Mr. al-'Owhali 's issues are serious is underscored by his June 2021 suicide attempt. In short, his psychiatric problems constitute a serious medical need.

61. As alleged above, ADX cannot provide adequate mental health care to inmates with serious mental illnesses. The effects of isolation combined with the known brutality of the correctional officers at ADX will exacerbate Mr. al-'Owhali 's condition. Knowingly placing Mr. al-'Owhali in a solitary confinement institution despite knowledge

of his serious psychiatric needs would be to consciously disregard his serious psychiatric needs.

**VII. Prayer for Relief**

Plaintiff Mohamed al-'Owhali respectfully requests that the Court:

a. Declare that transferring Mr. al-'Owhali to ADX would infringe upon his First Amendment rights to the free exercise of his religion;

b. Declare that transferring Mr. al-'Owhali to ADX would violate his Eighth Amendment right to be free from cruel and unusual punishment;

c. Declare that transferring Mr. al-'Owhali to the ADX would violate his Due Process rights under the Fifth Amendment.

c. Award Mr. al-'Owhali his attorneys' fees and costs;

d. Enter preliminary and permanent injunctive relief requiring the BOP and other defendants to refrain from transferring Mr. al-'Owhali to ADX or any other institution designed solely for solitary confinement; and

e. Grant any other relief that the Court deems just and proper.

Dated: November 8, 2021

By: */s/ Alan S. Mills*
Alan S. Mills Uptown People's Law Center
4413 North Sheridan Road
Chicago, IL 60640
773-769-1411 (tel)
773-769-2224 (fax)

14

alan@uplcchicago.org

OF COUNSEL:

Deborah M. Golden (admission pending)
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20002
202-630-0332 (tel)
202-217-3653 (fax)
dgolden@debgoldenlaw.com

15