## In the United States District Court
## for the District of Southern Illinois

Mohamed Al-ʻOwhali,

      Plaintiff,

  v.

Federal Bureau of Prisons, Michael Carvajal, Andre Matevousian, Barb von Blanckensee, and Daniel Sproul, in their official capacities,

      Defendants.

Case Number 21-cv-01399-SMY

## Complaint
## for Declaratory and Injunctive Relief

### I. Introduction

1.    This lawsuit was filed to address the imminent transfer of Mohamed al-ʻOwhali from United States Penitentiary Marion ("Marion") in Marion, Illinois to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX"). He has now been transferred from Marion to ADX.

2.    Defendants decided to transfer Mr. al-ʻOwhali in violation of the First, Fifth, and Eighth Amendments to the U.S. Constitution. The decision, made at Marion, was based on improper anti-Muslim animus in violation of the First Amendment, without providing Mr. al-ʻOwhali with a meaningful hearing, in violation of the Due Process clause of the Fifth Amendment, and with deliberate indifference to Mr. al-ʻOwhali's need for mental health treatment, in violation of the Eighth Amendment.

1

3.      Mr. al-'Owhali seeks declaratory and injunctive relief requiring the Federal Bureau of Prisons ("BOP") Defendants to comply with the Constitution by rescinding the decision to transfer him to the ADX and returning him to Marion.

## II. Jurisdiction

4.      Mr. al-'Owhali brings these claims under the First, Fifth, and Eighth Amendments to the United States Constitution.

5.      This Court's subject matter jurisdiction over the allegations in this Complaint is based on 28 U.S.C. § 1331, as the claims for relief arise under the United States Constitution.

6.      This Court's jurisdiction includes the power to address "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480 (1993).

7.      The decision to transfer Mr. al-'Owhali is highly likely to cause him increased illness and needless suffering.

## III. Venue

8.      Venue is proper in the Southern District of Illinois under 28 U.S.C. § 1391(b) because most of the acts or omissions that lead to Mr. al-'Owhali's claims, including the decision to transfer him, were made at Marion prison, which is in the Southern District of Illinois.

## IV. Parties

9.      Plaintiff Mr. al-'Owhali is a 44-year-old Saudi Arabian man currently incarcerated under the control of the BOP. BOP medical staff have diagnosed Mr. al-'Owhali with Suicidal

Ideation, General Anxiety Disorder, Depression, Bipolar Disorder, and Schizotypal Personality Disorder. He has repeatedly experienced suicidal ideation, and attempted suicide this past summer.

10.     Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice and administers federal prisons, including Marion and ADX. The BOP maintains physical custody of Mr. al-'Owhali and is charged with establishing policies and regulations that are safe, humane, and secure for all federal prisoners, including Mr. al-'Owhali.

11.     Defendant Michael Carvajal is the director of the BOP. Plaintiff al-'Owhali sues him in his official capacity.

12.     Defendant Andre Matevousian is the BOP's assistant director of the correctional programs division. Plaintiff al-'Owhali sues him in his official capacity.

13.     Defendant Barb von Blanckensee is the regional director for the North Central Region of the BOP. Plaintiff al-'Owhali sues her in her official capacity.

14.     Defendant Daniel Sproul is the warden of Marion. Plaintiff al-'Owhali sues him in his official capacity.

15.     Collectively, Defendants will be referred to as "Defendants" or "the BOP."

## V. Facts

**A.  The BOP's authority to hold people in extreme isolation is limited, because of the unique and severe harms it imposes.**

16.      "Extreme isolation" is the consensus term used by correctional experts to describe segregation from the mainstream prisoner population, where prisoners are involuntarily

confined to their cells for 20 to 24 hours per day, given at most extremely limited opportunities for direct and normal social contact with other people (i.e., contact that not mediated by bars, restraints, security glass, screens, or the like), and afforded extremely limited if any access to meaningful programming of any kind. *See* Craig Haney, *The Social Psychology of Isolation: Why Supermax Confinement is Psychologically Harmful*, Prison Service Journal, Jan. 2009, at 12 n.1; *see also Wallace v. Baldwin*, 895 F.3d 481 (7th Cir. 2018) (using "extreme isolation" to describe "disciplinary segregation" and holding that the risk of self-harm to a mentally ill man in such isolation is an imminent danger under 28 U.S.C. § 1915(g).)

17.     The practice of putting people in extended periods of extreme isolation has been viewed by courts, prison authorities, and the United Nations as a practice to be avoided in all but the most limited cases. *See, e.g.*, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, 66th Sess., U.N. Doc A/66/268 (Aug 5. 2011), https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement (Concluding that prolonged solitary confinement can produce harmful psychological effects and recommending that it be prohibited.)

18.     In 2015, The U.N. General Assembly revised the Standard Minimum Rules for the Treatment of Prisoners and renamed them the Mandela Rules in honor of Nelson Mandela. The Mandela Rules forbid the use of any solitary confinement for more than 15 days. Econ. & Soc. Counsel Res. 2015/20, Rules 43 & 44 (Sept. 29, 2015), https://undocs.org/A/RES/70/175.

**B. <u>ADX is a prison built for extreme isolation, and the conditions there are atypical and significant.</u>**

19.     At any given time, between 400 and 500 prisoners are housed at ADX.

20.     Depending on which unit they are in, prisoners spend at least 20 and as much as 24 hours per day locked alone in their cells.

21.     <u>The cells measure about 12 feet by 7 feet, the size of a typical parking space. The unencumbered space, available for movement is less than 12 feet by 5 feet.</u>

22.     <u>The cells have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with prisoners in adjacent cells. All ADX cells have solid doors with a small closable slot. Each cell is furnished with a concrete bed, desk, stool, and a stainless-steel combination sink and toilet. The beds are usually dressed with a thin mattress and blankets over the concrete. Each cell contains a single window, around 42 inches tall and 4 inches wide, which allows entry of some natural light, but which is designed to ensure that prisoners cannot see anything outside of their cells other than the building and sky.</u>

23. <u>A typical ADX cell looks like this:</u>



24. A diagram of a typical cell, like this, shows the presence of the toilet/sink unit and the double doors on the left.



25. Meals are delivered three times a day. In his small cell, a man eats, showers, urinates, defecates, and sleeps.

26. With few exceptions, prisoners in most ADX units are allowed out of their cells only for limited social or legal visits, some forms of medical treatment, visits to the "law library" (essentially a cell with a specialized computer terminal that provides access to a limited range of federal legal materials) and a few hours a week of segregated indoor or outdoor recreation. Otherwise, they remain locked in their cells.

27. On top of the standard cells at ADX, men live in the shadow of even harsher confinement in the Control Unit or Special Housing Unit and threats of other punitive measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail).

**C. Because of the atypical and significant conditions, there are particular regulations about placing men at ADX.**

28.     The BOP assigns men and women to prisons based on the rules in its Inmate Security Designation and Custody Classification manual. BOP Program Statement 5100.08, https://www.bop.gov/policy/progstat/5100_008.pdf.

29.     The decision to transfer a man to ADX is made outside the usual designation procedure. Published policy states that the decision is made by the BOP's North Central Regional Director and that he or she has "final review authority" over decisions to send a man to ADX. *Id.* at Sec. 21b.

30.     However, on information and belief, BOP has changed its internal policies so that now the assistant director for correctional programs fulfills that role.

31.     Mr. al-'Owhali was told orally of this change and the paperwork he was given references that a decision will be made by the assistant director.

32.     Men "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX." *Id.*

33.     "Serious mental illness" and "serious psychiatric illness" are terms of art in psychiatry and psychology.

34.     The National Institute of Mental Health defines "serious mental illness" as a "mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities." National Institute of Mental Health, Mental Illness, https://www.nimh.nih.gov/health/statistics/mental-illness.

35.     BOP policy "Treatment and Care of Inmates With Mental Illness" provides

guidance that the "following diagnoses are generally classified as serious mental illness:

- Schizophrenia Spectrum and Other Psychotic Disorder.

- Bipolar and Related Disorders.

- Major Depressive Disorder."

Program Statement 5310.16, Treatment and Care of Inmates With Mental Illness.

https://www.bop.gov/policy/progstat/5310_16.pdf.

36.     The policy then notes that "the following diagnoses are often classified as serious

mental illnesses, especially if the condition is sufficiently severe, persistent, and disabling:

- Anxiety Disorders.

- Obsessive-Compulsive and Related Disorders.

- Trauma and Stressor-Related Disorders.

- Intellectual Disabilities and Autism Spectrum Disorders.

- Major Neurocognitive Disorders.

- Personality Disorders."

*Id*.

37.     <u>Any referral to assign a prisoner to the extreme isolation of ADX must include a</u>
<u>detailed mental health evaluation done by a doctoral-level psychologist.</u> *Id.*


**D. <u>Because of the risks of rights violations, there are detailed regulations around</u>**
**<u>disciplinary actions taken against prisoners.</u>**

38.     The BOP conducts disciplinary hearings and imposes sanction on individuals under its care based on the rules in its Inmate Discipline Program. BOP Program Statement 5270.09, https://www.bop.gov/policy/progstat/5270.90_cn1.pdf.

39.     Parts of the Program Statement are taken verbatim from 28 C.F.R. pt. 541.

40.     Prisoners charged with disciplinary infractions have a right to request the investigating staff member interview any witnesses and obtain and review other evidence. *Id.* at 19, 28 C.F.R. Sec. 541.5(b)(2).

41.     The first review of a disciplinary charge is done by a Unit Discipline Committee. That Committee may (or in some cases, must) refer the charge to a Discipline Hearing Officer, who has the authority to impose harsher punishments.

42.     At a hearing before a Discipline Hearing Officer, a prisoner has a right to present documentary evidence and witnesses. *Id.* at 30, 28 C.F.R. 541.8(f).

43.     If the Discipline Hearing Officer declines to allow a witness, the reasons for the denial must be included in his report. *Id.* at 32.

44.     A prisoner may appeal the Discipline Hearing Officer's actions through the standard BOP administrative remedy process. *Id.* at 36.


**E. Mr. al-'Owhali has a long, documented history of Serious Mental Illnesses.**

45.     Mr. al-'Owhali grew up in Saudi Arabia, where he showed many symptoms of what is now understood to be ADD/ADHD, but opportunities for thorough diagnosis and treatment were limited.

46.     Since being incarcerated in 1998, Mr. al-'Owhali has been diagnosed with many psychiatric problems, including Suicidal Ideation, General Anxiety Disorder, Depression, Bipolar Disorder, and Schizotypal Personality Disorder.

47.     Suicidal Ideation describes a range of contemplations, wishes, and preoccupations with death and suicide.

48.     General Anxiety Disorder describes a disorder that gives a person extreme difficulty controlling anxiety over life's events and activities. It may include sensations of impeding danger or doom, increased heart rate, hyperventilation, trembling, and gastrointestinal problems.

49.     Depression describes a persistently depressed mood which creates a significant impairment in daily life.

50.     Bipolar Disorder, formerly called Manic Depression, consists of unusual and extreme fluctuations changes in mood, energy, activity, and concentration.

51.     Schizotypal Personality Disorder consists of odd behavior that may include paranoia, distorted perceptions, and magical thinking, and it is associated with significant functional impairment.

52.     In the BOP, Mr. al-'Owhali has been repeatedly placed on suicide watch.

53.     Mr. al-'Owhali has been taking psychiatric medications throughout his incarceration, including Buspar, Sertraline, and Amitriptyline.

54.     Buspar is an anti-anxiety medication.

55.     Sertraline in an antidepressant.

56.     Amitriptyline is a tricyclic antidepressant.

10

57.     BOP records confirm that getting a correct diagnosis has been hampered by lack of communication as Mr. al-'Owhali is a native Arabic speaker. The BOP has never provided Mr. al-'Owhali with an Arabic speaking mental health provider, and the translators have been of questionable quality.

58.     At times, Mr. al-'Owhali's mental state has been so disordered that he was unable to clean his cell or complete the simple worksheets that the BOP provides as therapy.

59.     Mr. al-'Owhali's most recent suicide attempt was in June 2021.

60.     All of these conditions taken together make Mr. al-'Owhali a person with a Serious Mental Illness.


**F. The Defendants moved Mr. al-'Owhali to ADX**

61.     While at Marion, Mr. al-'Owhali  served as one of the prayer leaders for his fellow Muslims. He was well-respected because he spoke Arabic fluently and had received a traditional Islamic religious education as a boy in Saudi Arabia.

62.     The BOP knew of and approved of his religious efforts for his fellow prisoners.

63.     While Muslim men may have shared a faith, they are not a unified block or gang.

64.     Mr. al-'Owhali  regularly heard various staff members make disparaging comments about the Muslim religion and Muslim prisoners.

65.     There were two disciplinary actions that preceded the BOP decision to transfer Mr. al-'Owhali  to ADX—report number 3464412 and report number 3471033.

66.     Report number 3464412 involved an alleged fight that took place on December 19, 2020.

67.     Report number 3471033 involved an alleged fight that took place on December 20, 2020.

68.     Originally, Mr. al-'Owhali was found guilty of both charges, but on appeal the Regional Director, Barb von Blanckensee, found an unspecified procedural error in both hearings.

69.     Although the error was never disclosed, Defendant von Blanckensee returned both charges to the prison for the Discipline Hearing Officer to conduct a rehearing.

70.     As far as Mr. al-'Owhali can tell, the new hearings suffered the same defects as the first hearings, as his staff representative failed to review the statement from a confidential informant or interview the witnesses he requested, as required by BOP regulations.

71.     On information and belief, during this period, Marion staff tried to send Mr. al-'Owhali to a "Special Management Unit." These are specialized higher security units for men who the BOP believe require more intensive management.

72.     BOP regulations generally prohibit men with Serious Mental Illnesses from being sent to the Special Management Units.

73.     On information and belief, the request to send Mr. al-'Owhali to a Special Management Unit was denied by a higher level BOP authority because his bipolar disorder made him a prisoner with a Serious Mental Illness and thus ineligible for that placement.

74.     Mr. al-'Owhali had a second round of disciplinary hearings. He was again found guilty of both charges on September 27, 2021.

75.     The final decision for report number 3471033 referred throughout to "Muslim inmates" and described them acting as a unified block.

76. The next day, September 28, 2021, Mr. al-'Owhali was served with a notice that the BOP was considering transferring him to ADX.

77. Although BOP policies provide Mr. al-'Owhali twenty calendar days in which to appeal his disciplinary findings, the BOP relied on the hearing findings in the transfer hearing, without giving him a change to appeal the findings.

78. Rather than provide Mr. al-'Owhali an opportunity to again appeal the disciplinary findings, the BOP held his transfer hearing the very next day, September 29, 2021. The hearing report references his "influential (leadership) role amongst the Muslim inmates" and cites the two disciplinary reports as proof.

79. At no point did the Administrator take into account Mr. al-'Owhali's mental health or the multiple diagnoses that disqualify him from placement in ADX.

## VI. Claims

### First cause of action: Lack of Due Process in violation of the Fifth Amendment

80. Transfer of Mr. al-'Owhali to ADX will impose a significant and atypical hardship, and any decision to do so must afford him Due Process.

81. Incarcerated people retain liberty interests against extreme isolation for which they are entitled to Due Process.

82. While generally, prisoners have no liberty interest in the location of their incarceration, a constitutional Due Process claim arises when extreme isolation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" *Sandin*

*v. Conner*, 515 U.S. 472, 484 (1995). In making this determination, courts should "analyz[e] the combined import of the duration of the segregative confinement and the conditions endured by the prisoner during that period." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009).

83.     Because the ordinary incidents of prison life do not include extreme isolation, transfers to ADX require a hearing which complies with the minimum requirements of Due Process. In Kervin v. La Clair Barnes, 787 F.3d 833, 836 (7th Cir. 2015), the court stated, "a prisoner may hold a liberty interest specifically in "being transferred from a prison in which he hadn't been in solitary confinement to one in which all prisoners are in solitary (or the common 23-hour approximation thereto), as at ADX, the federal 'Supermax' prison in Florence, Colorado." See also Wilkinson v. Austin, 545 US 209 (2005) (Ohio supermax) and *Westefer v. Snyder,* 725 F. Supp. 2d 735 (S.D. Illinois, 2010*)* (Illinois supermax).

84.     When a liberty interest exists, such as in avoiding extreme segregation, a prison system must provide the appropriate level of Due Process before transferring a prisoner to the extreme isolation.

85.     That process requires, at least, "advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least "some evidence" in the record, for any disciplinary action taken." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006).

86.     The Defendants did not provide due process.

87.     The process to which he was due includes but is not limited to providing him more information about what was prohibited about his leadership role in the Muslim community, as he is not responsible for other co-religionists respect for him.

88.     The process to which he was due also includes a review and consideration of his psychiatric conditions including his Serious Mental Illnesses.

89.     Such violations are impermissible under the Fifth Amendment and so the transfer of Mr. al-ʿOwhali to the ADX without those protections violates the Fifth Amendment to the U.S. Constitution.

## Second cause of action: Religious discrimination in violation of the First Amendment

90.     Anti-Muslim sentiments infuse and infect the BOP's transfer decision, as shown through the comments staff made and the records reference to "Muslim inmates."

91.     Such bias in impermissible under the First Amendment and so the decision to transfer Mr. al-ʿOwhali to the ADX based on that bias violates the First Amendment to the U.S. Constitution.

92.     Even where transfers would otherwise not violate Due Process, transfers in retaliation for exercise of First Amendment, including the right to practice one's religion, violate the First Amendment.

93.     The government may not enact policies or make decisions based on anti-Muslim bias. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) (upholding preliminary injunction because government's singling out of Sharia for disfavorable treatment likely violated the First Amendment.).

94.     Prison transfers which would otherwise be unreviewable and within the discretion of prison officials violate the First Amendment when they are in retaliation for the exercise of First Amendment Rights. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) and *Hoskins v.*

*Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) ("[c]onduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive.").

### THIRD CAUSE OF ACTION: CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT

95.   The practice of isolating incarcerated men and women by transferring them from the general prison population to extreme isolation has long been shown to cause a severe risk of grave physical and psychological harm. *See Kervin*, 787 F.3d at 837 (listing a sampling of the literature on the serious psychological effects of extreme isolation.). See also the detailed opinion of Judge Murphy of this court describing the impact on prisoners' mental health caused by transfers to Illinois' supermax prison at Tamms. *Westefer*, 725 F. Supp. 2d 735 (S.D. Illinois, 2010).

96.   Extensive research has shown that the practice of subjecting people to extreme isolation causes pain, suffering, psychological harm, emotional trauma, and, in extreme cases, death.

97.   Extreme isolation spikes the risks of physical harm such as suicide, self-harm and self-mutilation, cardiovascular and genito-urinary complications, tremulousness, gastro-intestinal impairment, heart palpitations, insomnia, migraines, loss of appetite, weight loss, deteriorated vision, sudden excessive perspiration, back and joint ailments, hypersensitivity to external stimuli, and lethargy.

98.   Extreme isolation also multiplies the risks of psychological harm such as post-traumatic stress disorder, hallucinations, severe and chronic depression, depersonalization, social

withdrawal, confusion, apathy, anxiety, heightened nervousness, night terrors, panic attacks, irrational anger, rage, loss of impulse control, paranoia, claustrophobia, concentration, memory deficiencies, and perception distortions.

99.     Supreme Court Justice Anthony Kennedy succinctly testified to Congress, "solitary confinement literally drives men mad." Lydia O'Connor, *Justice Anthony Kennedy: Solitary Confinement 'Literally Drives Men Mad,'* Huffington Post (Mar. 24, 2015, 5:46 PM, updated Mar. 25, 2015), https://www.huffpost.com/entry/anthony-kennedy-solitary-confinement_n_6934550.

100.     The effects are even more pronounced for people with pre-existing Serious Mental Illnesses, like Mr. al-'Owhali. For them, extreme isolation is the "mental equivalent of putting an asthmatic in a place with little air to breathe," and placement in these conditions violates the Eighth Amendment. *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995).

101.     Mr. al-'Owhali has multiple Serious Mental Illnesses.

102.     As seasoned correctional professionals, all the Defendants know of the above standards and the reasons that support them.

103.     Transfer of a person with Serous Mental Illness to extreme isolation, such as ADX, violations the Eighth Amendment. Thus, transfer of Mr. al-'Owhali to ADX violates the Eighth Amendment.


## VII. Prayer for Relief

Plaintiff Mohamed al-'Owhali respectfully requests that the Court:

a.      Declare that transferring Mr. al-'Owhali to ADX infringed upon his First Amendment rights;

b.      Declare that transferring Mr. al-'Owhali to the ADX violated his Due Process rights under the Fifth Amendment;

c.      Declare that transferring Mr. al-'Owhali to ADX violated his Eighth Amendment rights;

d.      Enter injunctive relief requiring the Defendants to rescind Mr. al-'Owhali's transfer decision and return him to Marion;

e.      Award Mr. al-'Owhali his attorneys' fees and costs; and

f.      Grant any other relief that the Court deems just and proper.


Dated: December 30, 2021


By: */s/ Deborah M. Golden*
Deborah M. Golden
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20002
202-630-0332 (tel)
202-217-3653 (fax)
dgolden@debgoldenlaw.com


Alan S. Mills
Uptown People's Law Center
4413 North Sheridan Road
Chicago, IL 60640
773-769-1411 (tel)
773-769-2224 (fax)
alan@uplcchicago.org